UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| BARRY L. LONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:07CV175 LMB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM**

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Barry L. Long for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Plaintiff's Complaint. (Document Number 11). Defendant has filed a Brief in Support of the Answer. (Doc. No. 16).

**Procedural History**

On August 16, 2000, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on February 15, 1991. (Tr. 117-19, 78-80). This claim was denied initially, by Administrative Law Judge (ALJ) Robert E. Ritter on May 16, 2002 following an administrative hearing, and by the Appeals Council of the Social Security Administration (SSA) on August 30, 2002. (Tr. 67, 12-19, 3-4). Plaintiff appealed the decision

of the ALJ to the United States District Court for the Eastern District of Missouri, and the case was remanded to the Commissioner for further consideration on March 11, 2004. (Tr. 452-69). On July 11, 2006, following an administrative hearing, ALJ F. Terrell Eckert, Jr. found that plaintiff was not disabled. (Tr. 237-43).

Plaintiff filed a new application for benefits on July 9, 2002, while his previous application was still pending. On March 23, 2004, ALJ Julian D. Cosentino found that plaintiff was disabled beginning on July 9, 2002. (Tr. 248-52).

On October 2, 2007, the Appeals Council denied plaintiff's request for review of the July 11, 2006 decision issued by ALJ Eckert. (Tr. 227-29). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A. ALJ Hearing

Plaintiff's supplemental administrative hearing was held on October 13, 2004. (Tr. 255). Plaintiff was present and was represented by counsel. (Id.). Witnesses Susan Long and Dorothy Long were also present. (Id.). The ALJ began the hearing by summarizing the procedural history of plaintiff's case. (Tr. 255-56). The ALJ indicated that plaintiff had filed a new application for benefits during the pendency of this application and that a different ALJ had found plaintiff disabled as of July 9, 2002. (Tr. 256). The ALJ noted that plaintiff was last insured for disability insurance benefit on September 30, 1995. (Id.). The ALJ stated that the period at issue in the instant action is, therefore, the period prior to September 1995 and the period prior to July 2002. (Id.). The ALJ then admitted the exhibits into the record. (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he was 44 years of age and

that he had attended school through the ninth grade. (Tr. 258). Plaintiff stated that he had not obtained a G.E.D. or received any vocational training. (Id.). Plaintiff testified that he was able to read to some extent. (Id.). Plaintiff stated that he was able to perform basic mathematics, although he had difficulty with multiplication and division. (Tr. 258-59).

Plaintiff testified that he was able to drive. (Tr. 259). Plaintiff stated he had experienced difficulty driving far distances for many years. (Id.).

Plaintiff testified that his problems began when he was involved in an accident in 1983 while operating a motorcycle. (Id.). Plaintiff stated that he was run over by a car while he was riding a motorcycle. (Id.). Plaintiff testified that his leg was broken in the accident and was repaired with plates and rods. (Id.). Plaintiff stated that he also broke his arm, broke ribs, injured his head, and injured his hip in the accident. (Id.). Plaintiff testified that he has undergone three operations on his leg. (Tr. 260). Plaintiff stated that his right leg, which was injured in the accident, is about two inches shorter than his left leg. (Id.). Plaintiff testified that he had experienced a non-union of his tibia[1] that was not healed. (Id.).

Plaintiff stated that he was confined to a wheelchair and was unable to walk for about a year after the accident in 1983. (Id.). Plaintiff testified that he was able to walk in the beginning of 1995, although he occasionally used crutches. (Tr. 261). Plaintiff stated that in 2001, his doctor found that his tibia had finally grown back. (Id.). Plaintiff testified that he was examined by a doctor in 2000, who indicated that there was mild evidence of non-union. (Id.).

Plaintiff stated that, at the time of the hearing, he did not use any assistive devices to walk.

---

[1]The medial and larger of the two bones of the leg, articulating with the femur, fibula, and talus. See Stedman's Medical Dictionary, 1989 (28th Ed. 2006).

(Tr. 262). Plaintiff testified that he did not use any assistive devices in 2000. (Id.). Plaintiff stated that he did not know when exactly he stopped using crutches, but he estimated that it was shortly after 1995. (Id.). Plaintiff testified that his right leg was better at the time of the hearing than it was from 1983 to 1995. (Id.).

Plaintiff stated that his back bothers him all the time. (Id.). Plaintiff testified that he injured his back in the motorcycle accident. (Id.). Plaintiff stated that he experienced the same amount of back pain at the hearing as he did between 1983 and 1995. (Id.). Plaintiff testified that he has difficulty bending, lifting, and sitting, due to his back impairment. (Tr. 263). Plaintiff stated that he is unable to sit for long before he has to stand up or lie down. (Id.). Plaintiff's attorney noted that plaintiff was leaning to the left during the hearing. (Id.). Plaintiff testified that he leaned to the left to relieve weight from his right side. (Id.). Plaintiff stated that he experiences muscle spasms in his back. (Id.). Plaintiff testified that he experienced muscle spasms in his back in 1995. (Id.).

Plaintiff stated that he did not know how far he was able to walk, although he could not walk the length of a football field. (Tr. 264). Plaintiff testified that he has to force himself to walk and the length he is able to walk varies. (Id.). Plaintiff stated that his ability to walk at the time of the hearing was about the same as it was in 1995. (Id.). Plaintiff testified that he is able to walk somewhat farther at the time of the hearing because he was taking pain medication. (Id.).

Plaintiff stated that he did not go to the doctor or take pain medication in 1995 because he lacked the finances to obtain treatment. (Id.). Plaintiff testified that his pain has decreased since he started taking medication when his application for benefits was approved. (Tr. 265). Plaintiff stated that he feels "dopier," since taking medication. (Id.).

Plaintiff testified that he also injured his right shoulder and wrist in the accident. (Id.). Plaintiff stated that he underwent nerve conduction tests, which revealed the source of his problems with gripping with his right hand. (Id.).

Plaintiff testified that he was able to work after his accident. (Tr. 266). Plaintiff stated that he worked for an excavation company that is owned by his friend. (Id.). Plaintiff testified that he operated a bulldozer and a back hoe for the excavation company. (Id.). Plaintiff stated that his friend allowed him to work only when he was able to work and that his hours varied greatly. (Id.). Plaintiff testified that he was not able to work for his friend in 1995. (Id.). Plaintiff stated that his right leg hurt when he operated the bulldozer, which occasionally prevented him from working. (Id.). Plaintiff testified that he did not remember when he last worked for his friend, although he estimated that it may have been in 1990. (Id.). Plaintiff stated that his condition worsened after he stopped working. (Tr. 267). Plaintiff testified that his condition was worse in 1995 than it was in 1990. (Id.).

Plaintiff's attorney then examined plaintiff's wife, Susan Long, who testified that she did not marry plaintiff until 2000, so she was unable to describe his condition in 1995. (Id.). Mrs. Long stated that she knew plaintiff in 1995 but she only saw him occasionally at that time because she was married to someone else. (Tr. 268). Mrs. Long testified that in 1999, plaintiff experienced pain constantly. (Id.). Mrs. Long stated that she lived with her mother at that time and she could observe plaintiff's pain when he visited her at her mother's home. (Id.). Mrs. Long testified that plaintiff did not take pain medication at that time so he self-medicated with alcohol. (Id.).

Plaintiff's attorney then examined plaintiff's mother, Dorothy Long, who testified that she

was aware that plaintiff was injured in the motorcycle accident in 1983. (Id.). Ms. Long stated that in 1995, plaintiff's condition was not good. (Tr. 269). Ms. Long testified that plaintiff had to use crutches to walk in 1995. (Id.). Ms. Long stated that plaintiff was experiencing difficulty with his leg healing where it was broken at that time. (Id.). Ms. Long testified that plaintiff experienced difficulty using his right hand and arm in 1995. (Id.).

Plaintiff's attorney argued that plaintiff met Listing 106A and B when he was insured due to his fractured tibia with no evidence of a solid union.

### B. Relevant Medical Records

The record reveals that plaintiff sustained fractures to the right tibia, fibula,[2] and radius[3] as a result of a motorcycle accident in 1983. (Tr. 182-209). Plaintiff underwent three surgical procedures to his right leg following the accident. (Tr. 210).

Plaintiff presented to Maynard L. Sisler, M.D. at the request of the state agency on September 14, 2000. (Tr. 210-13). Plaintiff complained of constant pain in his right lower leg, low back, and right hip as a result of a motorcycle accident he sustained in 1983. (Tr. 210). Plaintiff reported that the pain was worse after standing five minutes, walking one half of one block, bending, stooping, squatting, or lifting or carrying twenty-five pounds. (Id.). Plaintiff indicated that he was attended by no physician and took no medication, although his pain was relieved by any pain pill he could get. (Id.). Upon examination, Dr. Sisler noted decreased range of motion of the right lower extremity and hip. (Tr. 212-13). Dr. Sisler also noted that plaintiff walked with a limp, favoring his right leg. (Tr. 211). Dr. Sisler concluded that plaintiff bore the

---

[2]The lateral and smaller of the two bones of the leg. See Stedman's at 727.

[3]The lateral and shorter of the two bones of the forearm. See Stedman's at 1625.

- 6 -

residuals of an automobile accident that occurred seventeen years prior. (Id.).

Plaintiff underwent a right knee x-ray on November 15, 2000, which revealed no definite evidence of nonunion of fracture. (Tr. 214). Some mild evidence of loss of joint space in the compartment of the knee was noted. (Id.). No other significant arthritic changes were seen. (Id.).

Plaintiff presented to orthopaedic surgeon Edmund C. Laudry, Jr., M.D., on January 16, 2001, with complaints of right leg pain. (Tr. 225-26). Dr. Laudry noted that plaintiff walked with a right lower extremity limp without assistive devices. (Tr. 225). Plaintiff indicated that he was not taking any medications. (Id.). Upon examination, plaintiff had full motion of the right knee, with slight limitation of ankle and subtalar motion. (Id.). No crepitation, deficits, or instability was found. (Id.). Plaintiff had normal strength and tone, with no atrophy or abnormal movements. (Tr. 226). X-rays of the right tibia and fibula revealed solidly healed fractures of the mid-shaft tibia and fibula. (Id.). Dr. Laudry concluded that plaintiff had pain related to his residual old-healed fractures. (Id.). Dr. Laudry prescribed Celebrex[4] for plaintiff's residual leg aches. (Id.).

Plaintiff presented to David Diffine, M.D. on February 28, 2001, with complaints of general body aches and acid reflux. (Tr. 218-19). Plaintiff reported body aches, and chronic pain in his leg, shoulder, and hip. (Tr. 218). Upon physical examination, Dr. Diffine noted pain with range of motion in plaintiff's right hip and arm. (Id.). Dr. Diffine's assessment was generalized

---

[4]Celebrex is indicated for the relief of symptoms of osteoarthritis. See Physician's Desk Reference (PDR), 3097 (59th Ed. 2005).

osteoarthritis,[5] GERD,[6] and fatigue. (Id.). He prescribed Darvocet,[7] Celebrex, and Prilosec.[8] (Tr. 219). Plaintiff presented for follow-up of his GERD on March 1, 2001, and March 28, 2001. (Tr. 216-17).

Plaintiff presented to Yuli Soeter, M.D. on March 16, 2001, upon the referral of Dr. Diffine, for evaluation of right lower extremity pain. (Tr. 223-24). Plaintiff complained of numbness and pain on his whole right extremity. (Tr. 223). Dr. Soeter's assessment was right lower extremity neuropathic pain due to trauma. (Id.). Dr. Soeter started plaintiff on Neurontin.[9] (Id.). Plaintiff's Beck Depression Inventory was 33 out of 63. (Id.).

Plaintiff presented to G. Granada, M.D. on January 28, 2002, with complaints of right lower extremity pain and acid reflux symptoms. (Tr. 222). Plaintiff requested pain medication and new medication for his acid reflux. (Id.). Dr. Granada prescribed acid reflux medication and Ultram. (Id.). Plaintiff returned for a follow-up on February 11, 2002, at which time he complained of an earlobe mass. (Tr. 221). Plaintiff also requested medication refills. (Id.). Dr. Granada's assessment was earlobe mass, GERD, and osteoarthritis. (Id.). He referred plaintiff to

---

[5]Osteoarthritis is characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects weight-bearing joints. See Stedman's at 1388.

[6]Gastroesophageal reflux disease (GERD), is a syndrome due to structural or functional incompetence of the lower esophageal sphincter, which permits retrograde flow of acidic gastric juice into the esophagus. See Stedman's at 556.

[7]Darvocet is indicated for the relief of mild to moderate pain. See PDR at 402.

[8]Prilosec is indicated for the relief of heartburn. See PDR at 2791.

[9]Neurontin is indicated for the management of postherpetic neuralgia. See PDR at 2590.

an ENT for the earlobe mass, continued plaintiff's GERD medication, and prescribed Celebrex and Neurontin. (Id.). On March 11, 2002, plaintiff reported that the Neurontin was helping, although the Celebrex did not seem to be working well. (Tr. 220). Plaintiff also requested a stronger medication for his GERD. (Id.). Dr. Granada prescribed Nexium[10] for plaintiff's GERD and Darvocet for pain. (Id.). Plaintiff presented to Dr. Granada for medication refills on April 1, 2002, April 30, 2002, June 4, 2002, July 2, 2002, August 1, 2002. (Tr. 395-99).

On October 7, 2002, plaintiff presented to Licensed Clinical Psychologist Steve Larson, Ph.D., at the request of the state agency. (Tr. 390-92). Dr. Larson stated that plaintiff appeared to be fairly low functioning intellectually, although the level of his intelligence could not be pinpointed because no formal intellectual testing was performed. (Tr. 391). Dr. Larson expressed the opinion that plaintiff would have difficulty understanding anything beyond very simple verbal instructions and that he would have problems managing his own money. (Id.). Dr. Larson found that plaintiff demonstrated problems in his immediate and intermediate memory skills, which suggests that he would have difficulty remembering more complicated instructions. (Tr. 392). Dr. Larson found that plaintiff had adequate attention and concentration skills to work at a job that requires sustained attention and concentration and that he did not have any difficulty getting along with other people. (Id.). Dr. Larson's impression was adjustment disorder with

---

[10]Nexium is indicated for the treatment of GERD. See PDR at 623.

- 9 -

depression and anxiety, and probable low intellectual functioning, with a GAF[11] of 55-60.[12] (Id.).

**The ALJ's Determination**

The ALJ made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through September 30, 1995.

2. The claimant has not engaged in substantial gainful activity at any time relevant to this decision (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. Prior to July 9, 2002, the claimant had the following severe impairments: residuals of fractures to the right tibia, fibula, and radius (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that, prior to July 9, 2002, the claimant had the residual functional capacity to lift up to ten pounds frequently, sit at least six hours total in an eight-hour workday with normal breaks, stand and walk occasionally throughout the day in order to carry out work duties, and occasionally bend, twist, and stoop. He had no limitations in the use of his upper extremities, other than being limited to lifting no more than ten pounds.

---

[11]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[12]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

6. The claimant was unable to perform his past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 15, 1960 and was 35 years old on the date he was last insured for benefits and was 40 years old on the date of the applications now under consideration, which is defined as a younger individual aged 18 to 44 (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability due to the claimant's age (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11. The claimant was not under a "disability," as defined in the Social Security Act, from April 1994 to September 30, 1995 or from August 16, 2000 to July 9, 2002.

(Tr. 240-43).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits filed on August 16, 2000, the claimant was not disabled during any relevant time period under sections 216(I) and 223(d) of the Social Security Act.
>
> Based on the application for supplemental security income filed on August 16, 2000, the claimant was not disabled during any relevant time period prior to July 9, 2002 under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 243).

## Discussion

### A. Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA

will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

## B. The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a). The claimant has the burden of proving that s/he has a disabling impairment. See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895

(8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b). Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. Age, education and work experience of a claimant are not considered in making the "severity" determination. See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). This listing is found in Appendix One to 20 C.F.R. 404. 20 C.F.R. pt. 404, subpt. P, App. 1. If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired. See 20 C.F.R. §§ 404.1520 (d), 416.920 (d). If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work. See 20 C.F.R. § 404.1520 (e), 416.920 (e). If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled. See id. If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if

s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

**C.    Plaintiff's Claims**

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff also contends that the ALJ erred in using the Medical-Vocational Guidelines instead of obtaining vocational expert testimony because plaintiff suffers from non-exertional impairments. The undersigned will address plaintiff's claims in turn.

**1.    Residual Functional Capacity**

The ALJ made the following determination with regard to plaintiff's residual functional capacity:

> [a]fter careful consideration of the entire record, the undersigned finds that, prior to July 9, 2002, the claimant had the residual functional capacity to lift up to ten pounds frequently, sit at least six hours total in an eight-hour workday with normal breaks, stand and walk occasionally throughout the day in order to carry out work duties, and occasionally bend, twist, and stoop. He had no limitations in the use of his upper extremities, other than being limited to lifting no more than ten pounds.

(Tr. 240).

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating

physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer**,** 245 F.3d at 704.

Here, the ALJ did not cite any medical evidence in support of his residual functional capacity determination. In fact, the ALJ provided no explanation whatsoever for his determination. Further, there is no opinion by any physician, treating or consulting, regarding plaintiff's ability to function in the workplace. As such, there is no medical evidence in the record suggesting that plaintiff can, or cannot, perform sedentary work. At most, the ALJ determined what plaintiff can do based on the subjective complaints that the ALJ found credible, but the RFC must be based on some medical evidence; if there is no such evidence, the RFC "cannot be said to be supported by substantial evidence." Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995).

An ALJ has a duty to obtain medical evidence that addresses the claimant's ability to function in the workplace. See Hutsell, 259 F.3d at 711-712; Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000). Here, the ALJ's residual functional capacity assessment fails Lauer's test that the residual functional capacity be supported by *some* medical evidence. See Lauer, 245 F.3d at 703.

The court remanded this matter to the Commissioner for further development partly on the basis that there was no evidence to support the residual functional capacity formulated by the previous ALJ. (Tr. 452-69). The court noted that no physician had evaluated plaintiff in terms of his ability to perform work-related activities. (Tr. 468). On remand, the ALJ was instructed to

develop a more complete record to ascertain what level of work plaintiff was capable of performing. (Tr. 469). The record, however, reveals that the ALJ did not develop the record on remand as instructed by the court.

Accordingly, the court will order that this matter be reversed and remanded to the ALJ in order for the ALJ to formulate a new residual functional capacity for plaintiff, based on the medical evidence in the record and to order additional medical information addressing plaintiff's ability to function in the workplace.

**2.      Medical-Vocational Guidelines**

Plaintiff also argues that the ALJ erred by using the Medical-Vocational Guidelines, commonly known as the "Grids," instead of obtaining vocational expert testimony because plaintiff experiences significant pain, depression, a lack of manual dexterity, and low intellectual functioning, which are non-exertional impairments. Plaintiff contends that once a non-exertional impairment is shown to exist, vocational expert testimony is required.

As set forth above, once a claimant establishes that he or she is unable to return to past relevant work, the final step in the sequential process requires a determination of whether a claimant can perform other work in the national economy. "If an applicant's impairments are exertional, (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the Medical-Vocational Guidelines or 'Grids,' which are fact-based generalization[s] about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment." Gray v. Apfel, 192 F.3d 799, 802 (8th Cir. 1999) (quotation omitted). Use of the guidelines is permissible only if the claimant's characteristics match those contained in Grids and only if the

claimant does not have non-exertional impairments. See Foreman v. Callahan, 122 F.3d 24, 25 (8th Cir. 1997).

As explained by the Eighth Circuit, "[t]he grids [] do not accurately reflect the availability of jobs to people whose impairments are non-exertional, and who therefore cannot perform the full range of work contemplated within each table." Id. at 26. Accordingly, the Eighth Circuit requires "the Commissioner [to] meet his burden of proving that jobs are available for a significantly nonexertionally impaired applicant by adducing the testimony of a vocational expert." Id. "[W]here a claimant suffers from a non-exertional impairment which substantially limits his ability to perform gainful activity, the grid cannot take the place of expert vocational testimony." Id. (quoting Talbott v. Bowen, 821 F.2d 511, 515 (8th Cir. 1987)). "[A]n ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Lucy v. Chater, 113 F.3d 905, 908 (8th Cir. 1997).

The undersigned finds that the ALJ committed error by not eliciting the testimony of a vocational expert. The ALJ acknowledged that plaintiff suffers from residuals of fractures to the right tibia, fibula, and radius. (Tr. 240). Plaintiff experiences significant pain due to this impairments. Pain has been found to be a non-exertional impairment. See Gray, 192 F.3d at 802. Plaintiff also suffers from depression and low intellectual functioning. As discussed above, the ALJ formulated a residual functional capacity that was not supported by substantial evidence. Based on this erroneous residual functional capacity, he then applied the Medical-Vocational Guidelines and determined that plaintiff could perform other work existing in significant numbers

in the national economy.

Accordingly, the undersigned will order that the decision of the Commissioner be reversed and this matter be remanded to the ALJ in order for the ALJ to adduce the testimony of a vocational expert to determine how plaintiff's non-exertional impairments restrict his ability to perform jobs in the national economy.

## **Conclusion**

In sum, the decision of the ALJ finding plaintiff not disabled is not supported by substantial evidence. The ALJ failed to properly develop the record by not obtaining necessary medical evidence addressing plaintiff's ability to function in the workplace. The ALJ's assessment of plaintiff's residual functional capacity was not based on substantial medical evidence in the record thereby producing an erroneous residual functional capacity. The ALJ then improperly relied upon the Medical-Vocational Guidelines to find plaintiff not disabled. For these reasons, this cause will be reversed and remanded to the ALJ for further proceedings consistent with this Memorandum. Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this   26th   day of March, 2009.

                                                 /s/ Lewis M. Blanton
                                                 LEWIS M. BLANTON
                                                 UNITED STATES MAGISTRATE JUDGE